The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Kim L. Cramer and the briefs and oral arguments on appeal. With regards to its assignments of error, defendant has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award. However, with regards to her assignments of error, plaintiff has shown good ground to reconsider the evidence. Having reconsidered the evidence of record, the Full Commission modifies the prior Opinion and Award regarding plaintiff's psychiatric problems and the period during which she is entitled to benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing on 4 December 1996 as:
 STIPULATIONS
1. On 6 August 1996, the date of the alleged injury by accident giving rise to this claim, the parties were subject to and bound by the North Carolina Workers' Compensation Act.
2. On that date, the employee-employer relationship existed between plaintiff and defendant-employer.
3. On that date, the employer was self-insured for workers' compensation coverage, administered by Specialty Insurance Services.
4. Plaintiff's average weekly wage may be determined from a Form 22 wage chart to be submitted by defendant-employer (which was subsequently submitted in August, 1997).
5. The parties agreed to the submission of a Form 18, as well as various medical records.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a female who was born on 16 March 1952. She has been working for defendant-employer since the 1970's. She began working in the department which handles the hospitals supplies or "stock" in November 1981 and continued working in that position into 1996.
2. Plaintiff's job involved delivering various medical and other supplies throughout the hospital. The items would be placed on a cart, which could be rolled through the hospital to make these deliveries.
3. Prior to August 1996, plaintiff had a complicated medical history, both from a physical and psychological standpoint. She had suffered from migraine headaches and frequent back pain for several years. Plaintiff also suffers from diabetes and hyperthyroidism. Plaintiff has been under the care of a psychiatrist since October 1992, being treated for anxiety and continued panic attacks and occasional depression.
4. Around March 1996, plaintiff's employer, Memorial Mission Hospital, was involved in a merger of services with St. Joseph's Hospital. Plaintiff became very anxious that she might lose her job in the consolidation. Due to her anxiety, she sought treatment from her psychiatrist and she missed work during March of 1996.
5. As of 6 August 1996, plaintiff was on probation at work, due to excessive absenteeism and tardiness. She had been on such probation before. From that date forward, any additional unexcused absence could have served as the basis for termination.
6. On 6 August 1996, as she was unloading a box of dialysis fluid bags, plaintiff misjudged the weight of the box. She thought the box contained four bags of fluid, but it was only half full. As she unloaded the box, she used more force than was needed and twisted her back. Plaintiff felt an onset of pain in her upper back, between her shoulder blades.
7. Plaintiff reported her injury to her supervisor of four years, Mike Rosser. He told her that she should go to the emergency room, if needed. Plaintiff worked approximately another thirty minutes, but then reported to the emergency room at Memorial Mission Hospital because of her continued pain.
8. At the emergency room, plaintiff complained of pain in her back and between her shoulder blades which began when she bent and lifted a box. She did not make any complaints of lower back or leg pain at that time. Plaintiff was assessed with an acute back strain, and was given a note for light duty work.
9. Plaintiff did not report for work on 7 August or 8 August 1996. She returned to work on 9 August 1996, delivering supplies. She continued to experience pain in her upper back, and began to experience lower back pain and pain radiating into her left leg. Plaintiff returned to the emergency room on 9 August 1996, with these complaints and was referred to Aston Park Orthopaedic for further evaluation.
10. Around 14 August 1996, plaintiff went to see Mary Silver, a registered nurse, who served as the workers' compensation administrator for defendant. Plaintiff advised Ms. Silver of her initial injury and that she had been referred for an orthopaedic evaluation. Plaintiff also reported to Ms. Silver that a knot had developed in her upper back and that she was experiencing pain. Although Ms. Silver did not have the emergency room records, after checking with an emergency room doctor, Ms. Silver arranged for plaintiff to see a physical therapist in order to obtain ultrasound treatment for the knot and pain in her back.
11. Pursuant to Ms. Silver's direction, plaintiff went to physical therapy on or about 15 August 1996. However, the therapy increased plaintiff's upper and lower back pain. On 16 August 1996, plaintiff returned to the emergency room with these complaints, including her low back pain. Plaintiff's neurosurgical evaluation was then arranged with Dr. Eric Rhoton.
12. On 22 August 1996, plaintiff was seen by Dr. Eric Rhoton, a neurosurgeon. On that date, plaintiff was complaining of upper and lower back pain. Dr. Rhoton recommended a lumbar MRI and placed plaintiff on light duty with no lifting over ten pounds. By this date, defendant had already assigned plaintiff a different light duty job, which complied with this restriction.
13. Plaintiff's initial complaints at the time of her accident focused on pain in her upper back, between her shoulder blades. Because Dr. Rhoton was recommending a lumbar MRI, defendant took the position that the MRI was not related to plaintiff's accident of 6 August 1998 and denied coverage for it. However, defendant did not make any effort to seek clarification from Dr. Rhoton and on 10 September 1996, notified Dr. Rhoton by letter that authorization for the MRI was denied.
14. An MRI was later performed in early October 1996 at the request of Dr. Jones, plaintiff's treating psychiatrist at Charter Hospital. This MRI showed pre-existing degenerative changes, but no nerve compression and nothing requiring surgical intervention.
15. On 21 August 1996, due to her ongoing back complaints, plaintiff was assigned to a light duty position in defendant's mail room. This job did not involve any heavy lifting and was consistent with the restrictions imposed by Dr. Rhoton. Although she was temporarily assigned to the mail room, plaintiff remained under the supervision of Mike Rosser for the purposes of reporting any absences. However, there was some confusion regarding who was plaintiff's supervisor as Mr. Rosser did not set her work schedule or duties, which were instead set by another mail room employee, Ms. Annette Johnson.
16. Plaintiff was absent from work on 26 August and 27 August 1996, which were known by defendant to be unexcused. Defendant took no disciplinary action against plaintiff as result of these unexcused absences despite of her previously being placed on probation for attendance problems.
17. From 3 September 1996 through 6 September 1996, plaintiff did not report to work. Plaintiff did not call Mike Rosser to report her absences, but did report such absences to Ms. Johnson. Plaintiff did not see a doctor or seek a medical excuse for these absences until 6 September 1996. On that date, Dr. Rhoton's office provided plaintiff with a written excuse from work for 4 September 1996 through 13 September 1996 and indicated the doctor was awaiting the MRI scan which he had earlier recommended. This note complied with defendant's absentee policy of requiring a physician's note for an excused absence.
18. The work excuse from Dr. Rhoton was transmitted to the hospital administration via fax on 10 September 1996. On that date, the decision was made to terminate plaintiff's employment even though the medical note complied with defendant's own attendance policy. Plaintiff was terminated from her employment on or about 12 September 1996. Her termination was due to her work-related injury and her absences which were approved by Dr. Rhoton.
19. Following her termination, plaintiff saw Dr. William Anixter on 13 September 1996. At that time she was very tearful, anxious, and depressed. Due to her acute depression, panic attacks and her expression of suicidal and homicidal ideation, plaintiff was diagnosed as suffering from acute reaction of betrayal associated with the handling of her workers' compensation claim. Dr. Anixter then referred plaintiff to Charter Hospital.
20. Plaintiff returned to the emergency room on 17 September 1996, with severe suicidal thoughts and was diagnosed with acute suicidal ideation and acute exacerbation of chronic back pain. Due to her psychiatric condition, the emergency room staff arranged for plaintiff's admission to Charter Hospital in Asheville on 17 September 1996, where she came under the care of Dr. Ralph Jones. During her admission, plaintiff was diagnosed with bipolar disorder and psychotic features.
21. Plaintiff remained in Charter Hospital until her discharge on 22 November 1996. Following her discharge, she remained under the care of her regular psychiatrist, Dr. Anixter of Mountain Psychiatric Center.
22. Although she had a long history of psychiatric problems, plaintiff was managing fairly well until March 1996, when she suffered acute anxiety about the possible loss of her job due to the hospital merger. Thereafter, plaintiff's anxiety improved, and in the summer of 1996 she reported to Dr. Anixter that she felt better than she had in years. However, on 5 September 1996, immediately prior to her termination, plaintiff was noted by Dr. Anixter to be fearful of reinjuring her back and distressed about not being provided the medical treatment recommended by her physicians.
23. At the time of her back injury, plaintiff was in an emotionally vulnerable condition. Plaintiff's emotional condition was exacerbated by the manner in which defendant handled her injury and claim, particularly the refusal to authorize the MRI which had been recommended by a treating physician.
24. Plaintiff's back injury and the manner in which it was handled by defendant were significant contributing factors in the development of her anxiety and depression which necessitated her hospitalization at Charter in September 1996.
25. Plaintiff was seen by Dr. Freeman Broadwell, a specialist in physical medicine and rehabilitation, on 21 October 1996. Dr. Broadwell diagnosed plaintiff with a back strain and referred her to physical therapy. At that time, Dr. Broadwell did not have an opinion as to whether plaintiff was incapable of gainful employment due to her physical condition.
26. Plaintiff participated in physical therapy from 30 October 1996 through 22 January 1997. When he last saw plaintiff on 16 January 1997, Dr. Broadwell found her to be at maximum medical improvement regarding her back injury and assigned her a three percent (3%) permanent partial disability rating.
27. Although she was in some discomfort during this time, the greater weight of the evidence fails to establish that plaintiff was physically incapable of working during the period of 13 September 1996 to 22 November 1996.
28. Due to her psychiatric problems, which were causally related to her injury by accident, plaintiff was unable to earn wages in her former position with defendant or in any other employment from 13 September 1996 through 22 November 1996, the date of her release from Charter Hospital. Following her release on 22 November 1996, plaintiff was neither physically nor mentally unable to engage in gainful employment.
29. Although plaintiff was no longer disabled as the result of her psychiatric problems as of 23 November 1996, she will require additional medical treatment for this condition.
30. As of the time of the hearing on 4 December 1996, plaintiff had not sought gainful employment since her release from Charter Hospital. Her failure to seek employment is not justified. The evidence fails to show that she remains either mentally or physically incapable of earning wages.
31. On 6 August 1996, plaintiff's average weekly wage was $383.62, yielding a compensation rate of $255.76.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 6 August 1996, plaintiff's average weekly wage was $383.62, yielding a compensation rate of $255.76. G.S. § 97-2(5).
2. On 6 August 1996, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer, when she twisted her back as she was unloading supplies from a cart. G.S. § 97-2(6). As a result, plaintiff sustained a back strain in the thoracic area. Id.
3. Plaintiff's psychiatric problems, which necessitated her hospitalization, were caused or significantly exacerbated by her injury by accident and manner in which her claim was handled by defendant. Id.
4. As the result of her 6 August 1996 injury by accident and related psychiatric problems, plaintiff is entitled to be paid by defendant temporary total disability compensation at the rate of $255.76 per week for the period of 13 September 1996 through 22 November 1996. G.S. § 97-29.
5. Although plaintiff's termination was related to her injury by accident, any loss of wage earning capacity she sustained subsequent to 22 November 1996 was unrelated to her injury by accident and psychiatric problems, and was instead the result of her unjustified failure to seek employment. Russell v.Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). Therefore, plaintiff is not entitled to additional temporary total disability compensation after that date. G.S. § 97-2(9); G.S. § 97-29.
6. As the result of her injury by accident and the three percent (3%) rating to her back, plaintiff is entitled to be paid by defendant permanent partial disability compensation at the rate of $255.76 per week for the period of nine (9) weeks beginning on 16 January 1997. G.S. § 97-31(23).
7. Due to her back strain, plaintiff required medical assessment and treatment, including an MRI to rule out possible nerve impingement and a course of physical therapy, all of which was reasonable necessary to effect a cure or give relief. G.S. § 97-2(19); G.S. § 97-25.
8. As the result of her 6 August 1996 injury by accident and related psychiatric problems, plaintiff is entitled to have defendant pay for all reasonable medical expenses incurred. Id.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation at the rate of $255.76 per week for the period of 13 September 1996 through 22 November 1996. Subject to the attorney's fee approved herein, this compensation has accrued and shall be paid to plaintiff in a lump sum.
2. Defendant shall pay to plaintiff permanent partial disability compensation at the rate of $255.76 per week for the period of nine (9) weeks beginning on 16 January 1997. Subject to the attorney's fee approved herein, this compensation has accrued and shall be paid to plaintiff in a lump sum.
3. Defendant shall pay all medical expenses incurred as the result of plaintiff's 6 August 1996 injury by accident, including the cost of orthopaedic, and neurological evaluations, the MRI, physical therapy and treatment at Thoms Rehabilitation Hospital, the cost of plaintiff's hospitalization at Charter Hospital and expenses related to the treatment provided by Dr. Anixter. Defendant shall also pay for ongoing psychiatric expenses incurred by plaintiff, including prescription medications, which are necessary to effect a cure, give relief or lessen plaintiff's disability.
4. A reasonable attorney fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for plaintiff, and shall be deducted from the sum due plaintiff and paid directly to counsel for plaintiff.
5. Defendants shall pay the costs.
 S/ _______________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/ _____________________ LAURA K. MAVRETIC COMMISSIONER
S/ _____________________ DIANNE C. SELLERS COMMISSIONER